# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 09-CV-5251 (JFB)(AKT)
_____

ANTHONY M. CLAUDIO,

Plaintiff,

VERSUS

MATTITUCK-CUTCHOGUE UNION FREE SCHOOL DISTRICT,

Defendant.

_____

**MEMORANDUM AND ORDER**
April 16, 2014
_____

JOSEPH F. BIANCO, District Judge:

A jury found that the Matttituck-Cutchogue Union Free School District ("defendant" or "District") unlawfully terminated the employment of Anthony M. Claudio ("plaintiff" or "Claudio") on the basis of plaintiff's age, in violation of the Age Discrimination in Employment Act ("ADEA"). The jury awarded $70,000.00 as back pay damages.

Presently before the Court is plaintiff's motion for reinstatement of a position, front pay, lost benefits, attorneys' fees, and costs. For the reasons that follow, plaintiff's motion is granted in part and denied in part. First, the Court orders that defendant reinstate plaintiff to a teaching position in the District for which plaintiff is qualified. Specifically, on August 1, 2013, for the reasons stated on the record, the Court ordered orally on the record that defendant reinstate plaintiff to a teaching position in the District, defendant complied with the Court's order, and plaintiff has been teaching for the District since September 2013. This Memorandum and Order contains analysis memorializing the Court's reinstatement decision. In particular, the Court finds that there are positions available in the District for which plaintiff is qualified, and that this litigation has not irreparably damaged the relationship between plaintiff and defendant. However, although the Court orders reinstatement, the Court also concludes that plaintiff is not entitled to reinstatement with tenure, and that the seniority credit he accrued before his unlawful termination does not apply in his new teaching position. Second, the Court awards plaintiff front pay damages in the amount of $19,745, which represents plaintiff's lost wages in between the jury's verdict and the date of his reinstatement.

1

Third, the Court orders defendant to make the contributions to plaintiff's pension plan that defendant would have made had plaintiff continued to work full-time as a teacher from the date of his unlawful termination until the date of the jury's verdict. However, because the record is unclear as to whether plaintiff would have been entitled to any automatic salary increases over that period of time (such that it would have affected the amount of contributions to his pension), the Court orders that the parties submit supplemental letters on that issue before the Court determines the specific amount of contributions defendant must make to plaintiff's pension. Fourth, the Court awards plaintiff $83,447.50 in attorneys' fees, which represents 333.79 hours of his attorney's time at a rate of $250 per hour. Because plaintiff's attorney has not submitted documentation supporting plaintiff's request for costs, the Court defers decision on this request and grants plaintiff the opportunity to submit such documentation.

I. BACKGROUND

A. Facts

The Court has set forth the background facts of this case in a prior order denying defendant's post-trial motions, *see Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118 (E.D.N.Y. 2013), and does not repeat those facts here. Instead, the Court discusses all relevant facts in conjunction with its analysis of each issue raised by the instant motion.

B. Procedural Background

Plaintiff commenced this action against defendant on December 1, 2009. He alleged gender and age discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, the Americans with Disabilities Act, and the ADEA, as well as under 42 U.S.C. §§ 1981 and 1983, the Fourteenth Amendment to the Constitution, and New York laws against discrimination.

Plaintiff subsequently withdrew his federal claim under the Americans with Disabilities Act and his claims under New York State law. On September 29, 2011, the Court denied orally on the record defendant's motion for summary judgment on both plaintiff's ADEA claim and gender discrimination claim under Title VII; the Court granted the motion as to all other federal claims.

The remaining claims—gender discrimination under Title VII and age discrimination under the ADEA—were tried before a jury from October 9, 2012 to October 22, 2012. On October 22, 2012, the jury returned a unanimous verdict for plaintiff on his age discrimination claim, finding that defendant had discriminated against plaintiff based upon his age in connection with its termination of his employment as a teacher. The jury awarded $70,000.00 as back pay damages and $1.00 in nominal damages against the District. With regard to plaintiff's gender discrimination claim, the jury returned a verdict in defendant's favor.

Following the jury's verdict, defendant moved for (1) judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), and (2) a new trial pursuant to Federal Rule of Civil Procedure 59. Plaintiff cross-moved for reinstatement of a position, front pay, lost benefits, attorneys' fees, and costs. On July 24, 2013, the Court denied defendant's Rule 50 and Rule 59 motions, except insofar as the Court vacated the jury's award of nominal damages to plaintiff. The Court also ordered supplemental briefing on the issues of reinstatement, front pay, and lost benefits, and ordered plaintiff to submit

supplemental documentation in support of his motion for attorneys' fees.

On August 1, 2013, the Court held a hearing on the issue of reinstatement. At the end of the hearing, the Court granted orally plaintiff's motion for reinstatement. After the Court's reinstatement order, plaintiff resumed teaching for the District as a fourth grade teacher.

On September 16, 2013, plaintiff submitted supplemental briefing on his motion for reinstatement, front pay, lost benefits, attorneys' fees, and costs. Defendant submitted a supplemental memorandum in opposition to plaintiff's motion on October 4, 2013, and plaintiff replied on October 17, 2013. Defendant filed a sur-reply letter on October 21, 2013. The Court has fully considered all of the parties' submissions.

II. POST-TRIAL REMEDIES

A. Reinstatement

1. Legal Standard

The Second Circuit has "repeatedly emphasized the importance of equitable relief in employment cases." *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006). The ADEA, in particular, "confers upon the courts a 'broad grant of remedial authority' with which district judges are encouraged to 'fashion remedies designed to ensure that victims of age discrimination are made whole.'" *Banks v. Travelers Cos.*, 180 F.3d 358, 364 (2d Cir. 1999) (quoting *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727–28 (2d Cir. 1984)). "Among the forms of equitable relief explicitly authorized by the ADEA is reinstatement of the plaintiff's employment." *Id.* The ADEA provides, in relevant part:

> In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

29 U.S.C. § 626(b). Reinstatement, coupled with an award of back pay damages, is the preferred remedy for a victim of age discrimination because it "involve[s] the least amount of uncertainty." *Whittlesey*, 742 F.2d at 728; *see, e.g.*, *Morgenstern v. Cnty. of Nassau*, No. 04-CV-58 (ARL), 2009 WL 5103158, at *5 (E.D.N.Y. Dec. 15, 2009) ("[R]einstatement is the preferred remedy rather than front pay." (internal quotation marks and citations omitted)); *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01-CV-2762 (JGK), 2003 WL 22271223, at *13 (S.D.N.Y. Sept. 30, 2003) ("Reinstatement is the favored form of relief in discrimination and retaliation cases."); *Miano v. AC&R Adver., Inc.*, 875 F. Supp. 204, 224 (S.D.N.Y. 1995) ("The court recognizes the strong preference for reinstatement as the remedy for future lost earnings in discrimination cases."). "[I]n effect, [reinstatement and back pay] reestablish the prior employment relationship between the parties and at the same time assure the plaintiff of employment free of discrimination based on age." *Whittlesey*, 742 F.2d at 728.

Although reinstatement is the preferred remedy for employment discrimination, the Second Circuit has held that reinstatement is not a possible remedy where (1) there is "no

3

position available for plaintiff at the time of judgment" or (2) "the employer-employee relationship [was] irreparably damaged by animosity associated with the litigation." *Id.*; *see, e.g.*, *Banks*, 180 F.3d at 364 ("We have recognized, however, that reinstatement is not always feasible for instance, because no position may be available or because animosity may impede the resumption of a reasonable employer-employee relationship."); *see also Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 570 (S.D.N.Y. 2008) ("In the instant case, reinstatement is not feasible, given the damaged relationship between the parties."), *aff'd*, 344 F. App'x 628 (2d Cir. 2009). In such a circumstance, "[w]here an ADEA plaintiff is entitled to forward-looking relief but reinstatement is inappropriate, the district court has discretion to award front pay." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 169 (2d Cir. 1998); *see Whittlesey*, 742 F.2d at 729 ("[W]e think that front pay is, in limited circumstances, an appropriate remedy under the ADEA."); *Vernon v. Port Auth. of N.Y. & N.J.*, 220 F. Supp. 2d 223, 236 (S.D.N.Y. 2002) ("[T]he Second Circuit repeatedly has upheld awards of front pay, when reinstatement is not an option.").

Neither reinstatement nor front pay are appropriate, however, "where the employment term would already have ended by the time of judgment." *Banks*, 180 F.3d at 365; *see Kirsch*, 148 F.3d at 169 ("[R]einstatement is a forward-looking remedy that should not be awarded where the plaintiff's eligibility for relief under the ADEA has terminated before judgment."); *Geller v. Markham*, 635 F.2d 1027, 1036 (2d Cir. 1980) (reinstatement was inappropriate where plaintiff had been hired for only a one year term, unlawfully fired at the beginning of that term, and that term had expired before judgment). In other words, a court should not fashion remedies that give a victim of age discrimination more than he would have received in the absence of such discrimination.

### 2. Application

As an initial matter, defendant maintains that plaintiff is not entitled to any forward looking remedy (either reinstatement or front pay) because plaintiff was not entitled to employment with the District beyond his probationary term of one year, covering the 2008-2009 academic year. The Court disagrees. Although defendant is correct that prospective relief is inappropriate "where the employment term would already have ended by the time of judgment," the Second Circuit held in *Banks* that prospective relief is available where the plaintiff introduces evidence "from which it could be inferred that she would have been retained . . . had she not been discharged discriminatorily." *Banks*, 180 F.3d at 365. Here, the entire premise of the jury's back pay award was that plaintiff would have been employed by the District after the 2008-2009 academic year, but for unlawful age discrimination. In its July 24, 2013 Memorandum and Opinion, the Court held that this verdict was supported by the evidence. *See Claudio*, 955 F. Supp. 2d at 160–61. In other words, there was sufficient evidence introduced at trial from which it could be inferred that plaintiff would have been retained by the District had he not been subject to age discrimination. Accordingly, the Court concludes that prospective relief is appropriate in this case.

Next, the Court must decide whether reinstatement is a possible form of forward-looking relief in the instant case, keeping in mind the Second Circuit's preference for reinstatement over front pay damages. Defendant argues that reinstatement is inappropriate because there are no vacant positions for which plaintiff is qualified, and this litigation has irreparably damaged plaintiff's relationship with the District and

its employees. For the following reasons, the Court disagrees, and holds that reinstatement is an appropriate remedy in this case.

First, the Court finds that there is an available teaching position within the District for which the plaintiff is qualified. Although defendant previously submitted evidence that there were no vacant positions in the District (*see* McKenna Aff. ¶ 4, Jan. 22, 2013), by letter dated July 30, 2013, defense counsel informed the Court "that there is one vacant position in the elementary school which falls within Mr. Claudio's area of certification" (ECF No. 84). At the August 1, 2013 hearing, the Court did not require the District to reinstate plaintiff to that particular position, but the Court did find that the school district was hiring teachers. In other words, reinstating plaintiff to a teaching position with the District would not entail the termination of an innocent third party. *Cf. Wylucki v. Barberio*, No. 99-CV-1036SR, 2001 WL 34013676, at *3 (W.D.N.Y. Aug. 24, 2001) ("Since reinstatement of the plaintiff to the position of City Clerk would necessitate the removal of Michael Cox from that position, which he has held since 1999, Mr. Cox would unfairly be subjected to an adverse impact through no fault of his own.").

Second, there is no indication that this litigation has irreparably damaged plaintiff's relationship with the District and its employees. To the contrary, at trial, witnesses testified consistently about how much they liked plaintiff, even though they differed in their opinions on his teaching abilities. For instance, District Superintendent James McKenna ("McKenna")—the one who decided to terminate plaintiff's employment—explained that it was a difficult decision to terminate plaintiff's employment because he was "aware of the fact that Mr. Claudio had a persona in the school. The kids liked him. He helped coached, he chaperoned. He did various activities. He was a well liked person in the building." (Tr. 455.) Lynne Krauza, a board member of the District, echoed McKenna's sentiments, stating that "all of us as board members felt very badly about [learning that Claudio would be terminated] because everybody likes Tony Claudio, he is a very nice man, and we felt very badly that that was the way things were going to turn out for him." (Tr. 705.) The District's Director of Special Education, Patricia Desiderio, thought that plaintiff was "one of the most dynamic individuals when it comes to liking students. He has a beautiful rapport with students and kids in general and he is a very, very nice man." (Tr. 357; *see also* Tr. 358 ("He's a genuine, genuine individual who cares a great deal and he [is] vivacious and just such a nice man . . . .").) Similarly, Shawn Petretti, the Junior/Senior High School Principal in the District, described plaintiff as follows:

> Mr. Claudio's strengths outside the classroom were tremendous. His background with the local fire department, he played a key role in the safety plan of the school, the execution of all safety plans. He's at countless events, brought a lot of positive energy, was a go-to person. Every time I needed something done, I could count on him to do it and to do it well, a team player.

(Tr. 285–86.) Summing up this positive testimony about plaintiff, defense counsel made the following comments in her closing argument:

> There is no denying that everybody likes Mr. Claudio. Mr. McKenna, Mr. Petretti

5

and Ms. Desiderio all like Mr. Claudio. And I think you can tell from the testimony that you saw, you saw Trish Desiderio, she was testifying in a heartfelt way. He's a nice guy, has a great family, and it was a very difficult decision. So everybody, including Mr. McKenna, likes Mr. Claudio.

(Tr. 815.) Moreover, no witness at trial suggested that his or her relationship with plaintiff had soured since plaintiff commenced this lawsuit.

In light of the testimony elicited at trial, the Court concludes that this litigation has not irreparably damaged plaintiff's relationship with the District and its employees. Defendant points to no specific evidence to the contrary, only arguing generally that this litigation has created hostility between the parties. However, if the mere fact of a lawsuit were sufficient to hold that reinstatement were infeasible, then a court could never impose reinstatement, despite the ADEA's clear authorization of reinstatement as a possible remedy.[1] Moreover, as noted, the Second Circuit has confirmed that reinstatement is the preferred remedy under the ADEA, not an exceptional remedy reserved for extraordinary circumstances. *See, e.g.*, *Whittlesey*, 742 F.2d at 728.

In sum, the Court concludes that plaintiff is entitled to reinstatement to a teaching position in the District.

\* \* \*

The foregoing analysis supplements the Court's August 1, 2013 oral ruling ordering the District to reinstate plaintiff to a teaching position. However, the Court's August 1, 2013 ruling also allowed the District to determine plaintiff's specific placement in the system. As a result of this order, the District appointed plaintiff to a probationary position as an elementary school teacher for the fourth grade. (*See* Def.'s Letter, Aug. 21, 2013, ECF No. 88.) Plaintiff now objects to his placement in the elementary school on two grounds. First, he maintains that he should be reinstated to a teaching position *with tenure*. Second, plaintiff argues that he should be reinstated to a teaching position that would preserve the seniority he accrued prior to his termination—seniority that does not apply in his new teaching job. The Court takes up each objection in turn and concludes that plaintiff's placement as a fourth grade teacher, without tenure and without the benefit of his previously accrued seniority, is an adequate reinstatement remedy.

a. Tenure

Plaintiff makes two arguments for tenure: (1) by the time he was terminated unlawfully, he had earned tenure by estoppel, and (2) even if he had not been tenured before his termination, the Court should grant him tenure now.[2] The Court disagrees on both counts.

---

[1] To the extent defendant argues that the behavior of plaintiff's *counsel* has engendered ill will between plaintiff and the District, the Court concludes that the trial testimony demonstrates otherwise.

[2] The Court notes that, at the February 15, 2013 oral argument on this motion, plaintiff's counsel *explicitly* stated that he was requesting only reinstatement, not reinstatement with tenure. Specifically, plaintiff's counsel stated: "We're not specifically asking for tenure. Nowhere did we ask for tenure. We're just asking to be reinstated . . . ." However, since plaintiff has been reinstated to probationary employment with the District, plaintiff now asserts that he is entitled to tenure. Notwithstanding plaintiff's counsel's prior statement, the Court will consider the merits of plaintiff's arguments.

i. Tenure by Estoppel

Plaintiff argues that he had obtained tenure by the time he was terminated unlawfully. Analysis of this argument requires a brief summary of plaintiff's past employment for the District. Plaintiff worked for the District as a full-time teacher during the 2005-2006, 2006-2007, 2007-2008, and 2008-2009 academic years. (*See* Tr. 580–81.) Plaintiff's first three years of employment were probationary, meaning he did not have tenure but was under consideration for tenure at the end of his first three years. (*See id.*) Before the end of his third year, McKenna informed plaintiff that he would not be receiving tenure at the end of his third year of probationary employment. (*See* JUUL Agreement, Pl.'s Ex. 10 ("JUUL Agreement"); *see also* Tr. at 53 (admitting JUUL Agreement in evidence).) However, before plaintiff's third year of probationary employment ended, plaintiff signed a JUUL agreement dated May 12, 2008. (*Id.*) In that agreement, plaintiff extended his period of probationary employment by one year and agreed to, *inter alia*, the following conditions:

> I agree that I will not claim tenure by estoppel nor acquiescence arising by virtue of my employment at the [District] beyond September 1, 2008, and I acknowledge and agree that at the end of such additional probationary period the Superintendent may recommend or not recommend the award of tenure to me and the Board may either grant or refuse me tenure with the same consequence and exactly in the same manner as if such took place during the period immediately preceding September 1, 2008, pursuant to law, or under the labor agreement between the [District] and the Mattituck-Cutchogue Teachers Association.

(*Id.*)

In the instant motion, plaintiff argues "that he was a tenured teacher from the start of his fourth year." (Pl.'s Supp. Mem. at 1.) The basis for plaintiff's claim is the doctrine of tenure by estoppel, according to which tenure "is obtained 'when a school board accepts the continued services of a teacher or administrator, but fails to take the action required by law to either grant or deny tenure prior to the expiration of the teacher's probationary term.'" *Brenes v. City of New York*, 733 F. Supp. 2d 357, 360 (E.D.N.Y. 2010) (quoting *Brenes v. City of New York*, No. 07-5549-CV, 2009 WL 742163, at *3 (2d Cir. Mar. 23, 2009)); *see, e.g.*, *Orshan v. Anker*, 489 F. Supp. 820, 825 (E.D.N.Y. 1980) ("Tenure by estoppel has been found where a teacher continues to teach beyond the expiration of the probationary period, with the knowledge and consent of the Board, and continues to be paid for those services."). "The normal probationary period that a teacher must complete is three years . . . ." *Brenes*, 733 F. Supp. 2d at 360; *see* N.Y. Educ. Law § 2573(1)(a) ("Teachers . . . shall be appointed by the board of education, upon the recommendation of the superintendent of schools, for a probationary period of three years . . . ."). Thus, plaintiff contends that he obtained tenure during his fourth year as a full-time teacher, when the District school board continued to accept plaintiff's services without granting or denying him tenure.

The fatal flaw in plaintiff's argument is the existence of the JUUL agreement that plaintiff signed before the end of his third year as a full-time teacher. In that agreement,

7

plaintiff extended the term of his probationary employment and waived his right to claim tenure by estoppel on the basis of his fourth probationary year of employment. New York law recognizes the validity of such an agreement. *See generally Juul v. Bd. of Educ. of Hempstead*, 428 N.Y.S.2d 319 (N.Y. App. Div. 1980), *aff'd*, 55 N.Y.2d 648 (1981)). As one court has explained, "[p]rior to the expiration of the probationary period, a district and a teacher may enter into an agreement to extend a probationary period for an additional year when the teacher will not be recommended for tenure." *Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 413 (E.D.N.Y. 2008) (citing *Juul*, 428 N.Y.S.2d 319). The execution of a valid JUUL agreement precludes a teacher from invoking tenure by estoppel. *See, e.g.*, *Chisholm v. Hochman*, 971 N.Y.S.2d 150, 152 (N.Y. App. Div. 2013) ("Here, as indicated by the petitioner's own letter to the principal, the petitioner agreed to extend his probationary period for an additional year. Consequently, the petitioner's probationary period had not expired when the School District terminated his employment and, thus, he had not acquired a tenured position by estoppel.").

Although plaintiff's counsel made numerous attempts to question the JUUL agreement's validity at trial, there is no basis to invalidate the JUUL agreement. In sum, a JUUL agreement represents a valid method for extending a teacher's probationary period without giving rise to tenure by estoppel, and this Court cannot conclude that the JUUL agreement plaintiff signed is invalid. Accordingly, the Court concludes that plaintiff did not acquire tenure by estoppel during his fourth probationary year as a full-time teacher.

Moreover, the Court disagrees with plaintiff's suggestion that the four years he would have been employed by the District, but for his unlawful termination, could support tenure by estoppel. "Recognizing that tenure laws are in derogation of common law freedom to contract, the State courts have strictly construed them and will recognize a tenure gained through estoppel only if the teacher has rendered actual service beyond the term of probation." *LaBarr v. Bd. of Educ. of Union Free Sch. Dist. No. 1, Town of Hempstead, Nassau Cnty., N.Y.*, 425 F. Supp. 219, 223 (E.D.N.Y. 1977) (citing *Mugavin v. Nyquist*, 367 N.Y.S.2d 604 (N.Y. App. Div. 1975), *aff'd*, 39 N.Y.2d 1003 (1976)). *LaBarr* is instructive here. In *LaBarr*, the plaintiff's probationary employment began on December 4, 1969, and was terminated on July 5, 1972. Plaintiff challenged his termination and, on December 5, 1972, obtained reinstatement and back pay from September 1972 to the date of judgment. Plaintiff contended that he had acquired tenure by estoppel as of December 5, 1972—the date of judgment—because the combination of the time of his actual employment as a teacher and the time for which he received back pay amounted to one day more than three years of teaching. The court disagreed, holding that plaintiff was not entitled to tenure by estoppel because he had not rendered actual service to the school district after his termination. *See id.* ("Here the Board did not acquiesce in or consent to plaintiff's continuance in employment in any way, albeit pursuant to court order plaintiff was paid for the 1972-73 school year."). The court finds the analysis in *LaBarr* to be persuasive, and similarly concludes here that plaintiff cannot rely on the four years that he should have been teaching, but was not, to establish tenure by estoppel.

### ii. Court Ordered Tenure

To the extent plaintiff requests reinstatement to a tenured position on any basis other than tenure by estoppel, the Court

rejects this request.[3] Courts have been cautious to avoid intruding upon the administration of a school district or university system, even in the context of remedying employment discrimination. *See, e.g.*, *Meling v. St. Francis Coll.*, 3 F. Supp. 2d 267, 276–78 (E.D.N.Y. 1998). As the New York Court of Appeals has observed on review of a teacher's claim of discrimination and unlawful retaliation in the New York City school system, "'[n]either the [New York City] commission [on Human Rights] nor the courts should invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure.'" *Maloff v. City Comm'n on Human Rights*, 38 N.Y.2d 329, 334 (1975) (quoting *Pace Coll. v. Comm'n on Human Rights of N.Y.C.*, 38 N.Y.2d 28, 38 (1975)); *see also N.Y. Inst. of Tech. v. State Div. of Human Rights*, 40 N.Y.2d 316, 322 (1976) (holding that agency erred in granting tenure as remedy for discriminatory denial of tenure). Thus, in *Meling*, the court ordered that the defendant reinstate plaintiff to a teaching position, but the court did not order tenure because the court believed it was "ill-equipped" to make a tenure decision. *Id.*

Similarly, in the instant case, the Court awards reinstatement but declines to award the plaintiff tenure. Micromanaging the District to the point of making tenure decisions on the District's behalf would amount to the sort of academic oversight that courts strive to avoid. Accordingly, plaintiff's request for tenure is denied.

### b. Seniority

Seniority credit matters for plaintiff because, under New York law, "[w]here a teaching position is consolidated or abolished, 'the services of the teacher having the least seniority in the system within the tenure of the position abolished shall be discontinued.'" *Seney v. Bd. of Educ. of E. Greenbush Cent. Sch. Dist.*, 962 N.Y.S.2d 397, 399 (N.Y. App. Div. 2013) (quoting N.Y. Educ. Law §§ 2510(2), 3013(2)). The applicable regulations define "seniority" to mean the "*length of service in a designated tenure area, rather than length of service in the district*; such service need not have been consecutive but shall during each term for which seniority credit is sought, have constituted a substantial portion of the time of the professional educator." N.Y. Comp. Codes R. & Regs. tit. 8, § 30-1.1(f) (emphasis added). Pre-kindergarten through sixth grade education constitutes "the elementary tenure area." *Id.* § 30-1.4. Higher level education is divided into different tenure areas.[4] Thus, a teacher who begins teaching in a new tenure area is the least senior member in her tenure area, regardless of her prior years of experience in a different tenure area.

In the instant case, plaintiff contends that the Court should reinstate him to the fourth grade teaching position *with four years of seniority credit in that tenure area*. Otherwise, plaintiff maintains, he will have

---

[3] The Court notes that, at the February 15, 2013 oral argument on this motion, plaintiff's counsel explicitly stated that he was requesting only reinstatement, not reinstatement with tenure. However, since plaintiff has been reinstated to probationary employment with the District, plaintiff now asserts that he is entitled to tenure.

[4] "In those schools in which instruction in the core academic subjects has not been departmentalized at the seventh and/or eighth grade levels, such grades shall constitute the middle grades tenure area. In those grades at or above seventh grade level in which instruction in the core academic subjects is departmentalized, the core academic subjects shall be grouped for tenure purposes into the academic tenure areas of English, social studies, mathematics, science and foreign languages." N.Y. Comp. Codes R. & Regs. tit. 8, § 30-1.4.

lost the seniority that he accrued before he was unlawfully terminated. However, plaintiff fails to appreciate that, under the New York Education Law, he never earned general seniority credit; instead, he earned seniority credit specifically for the grade levels and subjects that he taught.[5] *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 30-1.4. Thus, if the District had never unlawfully terminated plaintiff, but had simply transferred him to the fourth grade for a completely nondiscriminatory reason, plaintiff still would have been the least senior teacher in the elementary tenure area upon his transfer. In other words, if this Court granted plaintiff the relief he seeks, the Court would be conferring upon plaintiff a benefit that he never had: seniority that is transferable from one tenure area to another. Moreover, plaintiff has not lost the seniority credit that he accrued; if the District transferred him back to one of his former teaching positions, then plaintiff would benefit from the seniority credit that he accrued in that area. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 30-1.1(f) (defining seniority to mean "length of service in a designated tenure area," and stating that "such service need not have been consecutive").

\* \* \*

In sum, the Court grants plaintiff's request for reinstatement to a teaching position in the District. However, the Court denies plaintiff's requests for tenure and for seniority credit in his new teaching position.

B. Front Pay

Having determined that plaintiff is entitled to reinstatement, the Court turns to plaintiff's request for front pay for the time in between the jury's verdict and the date that plaintiff was reinstated.

Generally, "front pay" has been understood by courts as "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001); *see, e.g.*, *Gerstenbluth v. Credit Suisse Sec. (USA) LLC*, 728 F.3d 139, 143 n.6 (2d Cir. 2013). Thus, if "an appropriate position for the plaintiff is not immediately available . . . , courts have ordered reinstatement upon the opening of such a position and have ordered front pay to be paid until reinstatement occurs." *Pollard*, 532 U.S. at 846.[6]

Here, plaintiff argues that he should be awarded $19,745 in front pay for the eleven months in between the jury's verdict in October 2012 and his reinstatement to a teaching position in September 2013. Plaintiff derives this figure from the jury's back pay award of $70,000, which this Court determined was a reasonable and well supported amount of back pay damages for the thirty-nine months in between the date of plaintiff's termination and the date of the verdict. *See Claudio*, 955 F. Supp. 2d at 160–61. The $70,000 in back pay over thirty-nine months equals approximately $1,795 per month.[7] Plaintiff multiplies that monthly figure by eleven to arrive at $19,745.

Defendant does not object to this front pay award (except to the extent defendant argues that plaintiff is not entitled to any form of prospective relief), *see supra*, and the Court finds that this amount represents a fair and reasonable amount of front pay damages

---

[5] Plaintiff testified that he taught eighth grade special education in his first, second, and third years as a full-time teacher (Tr. at 581, 644–45, 647), and high school social studies in his fourth year as a full-time teacher (Tr. at 562).

[6] In addition, as noted *supra*, "courts have ordered front pay as a substitute for reinstatement" where reinstatement is not possible. *Pollard*, 532 U.S. at 846.
[7] $70,000 ÷ 39 = $1,794.87.

that, along with back pay and reinstatement, makes plaintiff whole. Accordingly, the Court grants plaintiff's request for front pay damages in the amount of $19,745.

C. Pension Benefits

Finally, plaintiff requests relief for his lost pension benefits. For the following reasons, the Court grants this request.

"Compensation for lost pension benefits is an essential component of the relief to which victims of discrimination are entitled." *Equal Emp't Opportunity Comm'n v. Yellow Freight Sys., Inc.*, No. 98-CV-2270 (THK), 2002 WL 31011859, at *31 (S.D.N.Y. Sept. 9, 2002) (citing *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 374 (2d Cir. 2000) ("If [plaintiff] was denied compensation for lost pension benefits, he was not made whole, and thus did not receive the proper measure of relief under the anti-discrimination laws.")). The Second Circuit has "distinguished two kinds of relief that may compensate a victim of discrimination for his lost pension benefits." *Sharkey*, 214 F.3d at 375 (citing *Banks*, 180 F.3d at 365). "First, the plaintiff's lost service and salary credits may be restored to his pension plan." *Id.* This is post-trial, equitable relief. *See id.*; *Banks*, 180 F.3d at 365; *Geller*, 635 F.2d at 1036 ("As distinguished from damage awards, which are payable to the plaintiff, pension benefits are paid into pension annuity funds. They merely replace the benefits that would have accrued during the year of employment wrongfully denied to [plaintiff]."). Second, "it is also possible to award money damages to compensate the plaintiff for the value of the pension benefits that were lost. This form of legal relief is proper for a jury to award." *Sharkey*, 214 F.3d at 375.

Here, plaintiff seeks equitable relief, *i.e.*, the restoration of lost service and salary credits to his pension plan. (Pl.'s Supp. Mem. at 5 ("Plaintiff requests restoration of the pension benefits which he lost because of his wrongful termination.").) To determine whether plaintiff is entitled to such relief, the Court must decide whether the jury's award of $70,000 in back pay included the value of plaintiff's lost pension benefits, as defendant contends it did. *See Sharkey*, 214 F.3d at 375 ("[T]he district court should make a determination whether the jury's award included the value of lost pension benefits. If not, [plaintiff] is entitled to equitable relief to provide him with his lost pension entitlement. If so, he has already been compensated, and is not entitled to equitable relief that would duplicate the relief awarded by the jury.").

Based on the evidence adduced at trial and the Court's instruction to the jury on back pay damages, the Court concludes that the jury's award of $70,000 in back pay did not include the value of lost pension benefits. Plaintiff himself testified only in vague terms about the retirement benefits he lost after his termination. (*See* Tr. 559, 561.) Likewise, plaintiff's counsel argued in closing that the $70,000 requested in back pay damages represented only the difference between plaintiff's salary as a teacher and his more recent, lower salary as an employee in his family's restaurant. (*See* Tr. 812 ("He just wants the difference between his tax returns and what he would have made as a special ed teacher, and it comes to about $22,000 a year. So round it off to $70,000 for three years. That's the difference known as back pay."); *see also* Tr. 846.) Nonetheless, defendant argues that the jury's award necessarily included the value of lost pension benefits because the Court's charge to the jury referenced lost wages and benefits. The Court defined back pay damages as follows:

> Now back pay damages. With respect to the issue of lost wages, you may award as actual damages an amount

that reasonably compensates for the plaintiff for any lost wages *and benefits*, taking into consideration any increase in salary *and benefits* that a plaintiff would have received from the defendant had he not been subject to the intentional discrimination. That is what is referred to as back pay.

(Tr. 880 (emphasis added).) However, the Court's two references to benefits, in the context of a trial that produced absolutely no evidence about the value of plaintiff's pension plan, cannot support a conclusion that the jury included plaintiff's lost pension benefits in its back pay award. *See Sharkey*, 214 F.3d at 375 (holding that jury instructions referencing "benefits" and "pension benefits," without more, were insufficient to conclude that the jury's award included the value of lost pension benefits). Moreover, based on the amount of the jury's award (and counsel's specific argument to the jury that such amount constituted back pay), it is clear that the jury awarded plaintiff only the difference between his salary as a teacher and his more recent salary as an employee in his family's restaurant. *See Claudio*, 955 F. Supp. 2d at 161.

Accordingly, the Court must award plaintiff lost pension benefits in order to make him whole. *See Yellow Freight Sys., Inc.*, 2002 WL 31011859, at *32 ("[I]t is clear that Plaintiff will not be made whole, and Defendant will unjustly enjoy a substantial windfall, if no compensation is made for Plaintiff's lost pension benefits."). Specifically, the Court orders defendant to make the contributions to plaintiff's pension plan that defendant would have made had plaintiff continued to work full-time as a teacher from the date of his unlawful termination until the date of the jury's verdict. *See Sharkey*, 214 F.3d at 374–75 (noting that a plaintiff is entitled to service and salary credits for the same period as the jury awarded back pay damages, but that an award for lost pension benefits is "not a form of 'prospective relief'"); *Yellow Freight Sys., Inc.*, 2002 WL 31011859, at *32 (ordering defendant to make contributions to pension fund that it would have made had plaintiff worked full-time during the period for which back pay was awarded). These contributions should take into account any automatic increases in salary to which plaintiff would have been entitled by law. However, because the record is unclear as to whether plaintiff would have been entitled to any automatic increases in salary during that period, the Court requests that plaintiff and defendant each submit a supplemental letter on this issue. The Court also plans to hold a telephone conference with the parties before deciding this issue.

III. ATTORNEYS' FEES AND COSTS

Plaintiff also requests $196,789 in attorneys' fees and $5,967 for costs incurred during this litigation. Defendant contends that plaintiff's requested attorneys' fees should be reduced "by at least fifty (50%) percent." (Def.'s Mem. at 13.) Defendant does not object to plaintiff's request for costs. For the following reasons, the Court awards plaintiff $83,447.50 in attorneys' fees and defers decision on plaintiff's motion for costs.

"The general rule in our legal system is that each party must pay its own attorney's fees and expenses." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010). However, the ADEA provides explicitly that "attorneys' fees may be awarded to the prevailing party." *Brooks v. Travelers Ins. Co.*, 297 F.3d 167, 171 (2d Cir. 2002); *see* 29 U.S.C. §§ 216(b) ("The court in such action shall, in addition to any judgment awarded to

the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."), 626(b) (incorporating by reference § 216(b)); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) ("A prevailing party in an action brought under the ADEA is entitled to recover attorney's fees . . . .").

Generally, to determine a reasonable attorney's fee, a court must calculate a "lodestar figure," which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997). "Both [the Second Circuit] and the Supreme Court have held that the lodestar . . . creates a 'presumptively reasonable fee.'" *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); citing *Perdue*, 559 U.S. 542). "'[T]he lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee' . . . ." *Perdue*, 559 U.S. at 553 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66 (1986)). Thus, the Supreme Court has recognized that "the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Id.* at 551. "The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing *Hensley*, 461 U.S. at 433).

A. Reasonable Hourly Rate

"The reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 190. The Second Circuit's "'forum rule' generally requires use of 'the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee.'" *Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 290 (2d Cir. 2011) (quoting *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)). "Fees should not be awarded at higher out-of-district rates unless 'a reasonable client would have selected out-of-district counsel because doing so would likely . . . produce a substantially better net result.'" *Id.* (quoting *Simmons*, 575 F.3d at 172). In *Arbor Hill*, the Second Circuit also instructed district courts to consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92–93 (1989). *See* 522 F.3d at 190.

> The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and

length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3 (quoting *Johnson*, 488 F.2d at 717–19). Finally, a district court should also consider "that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," and "that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.* at 190. "The burden rests with the prevailing party to justify the reasonableness of the requested rate," and plaintiff's attorney "should 'establish his hourly rate with satisfactory evidence—in addition to the attorney's own affidavits." *Hugee*, 852 F. Supp. 2d at 298.

"Courts have awarded rates of $200 to $400 per hour for partners in this district." *Capone v. Patchogue-Medford Union Free Sch. Dist.*, No. 04-CV-2947 (JS)(MLO), 2011 WL 743573, at *2 (E.D.N.Y. Feb. 23, 2011); *see also United States v. Jones*, No. 11-CV-2869 (JFB), 2013 WL 6408639, at *3 (E.D.N.Y. Dec. 9, 2013) (noting that "recent Eastern District cases have indicated that the range of appropriate billing rates in this District is $200-$375 for partners"). Of course, in light of the numerous factors that courts in this circuit consider to determine a reasonable hourly rate, "the range of 'reasonable' attorney fee rates in this district varies depending on the type of case, the nature of the litigation, the size of the firm, and the expertise of its attorneys." *Siracuse v. Program for the Dev. of Human Potential*, No. 07-CV-2205 (CLP), 2012 WL 1624291, at *30 (E.D.N.Y. Apr. 30, 2012).

Here, plaintiff's counsel Frank Blangiardo ("Blangiardo"), who performed all work on behalf of plaintiff in this action, requests a rate of $395 per hour. In support of this request, he has submitted an affidavit stating that he "graduated from Brooklyn Law School in 1988," has "been a solo practitioner for twenty-five years," and that he "recorded [his] first verdict in the Eastern District before the Honorable Arthur D. Spatt in 1989." (Blangiardo Aff., Sept. 16, 2013.) Blangiardo also submitted an affidavit from Arthur V. Graseck, Jr., Esq., who states that he worked with Blangiardo for over five years "and [has] found him to have extensive experience in the field of employment law and civil rights litigation." (Graseck Aff., Dec. 20, 2012.)

In light of the prevailing hourly rates in this district, and all other factors set forth in *Arbor Hill*, the Court concludes that $250 per hour is a reasonable hourly rate for Blangiardo. The Court bases this conclusion primarily on its own observations of Blangiardo's abilities over the course of this litigation. In particular, Blangiardo's performance—along with the affidavits submitted in support of his fee request—show that, although he is an experienced lawyer, he does not have significant experience in the area of age discrimination or employment discrimination cases. Accordingly, this Court concludes that an hourly rate at the high end of the range in this district is unwarranted. *See Hugee*, 852 F. Supp. 2d at 300 ("The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields."); *Konits v. Valley Stream Cent. High Sch. Dist.*, No. 01-CV-6763 (LDW), 2010 WL 2076949, at *2 (E.D.N.Y. May 19, 2010) ("The Court finds that the range of $300-400 per hour is an appropriate range for experienced attorneys in employment discrimination actions in this district."), *aff'd sub nom. Konits v. Karahalis*, 409 F. App'x

418 (2d Cir. 2011); *cf. Capone*, 2011 WL 743573, at *2 (holding that $275 per hour was a reasonable hourly rate for a partner with over fifteen years of experience in labor and employment law); *Luca v. Cnty. of Nassau*, 698 F. Supp. 2d 296, 301–02 (E.D.N.Y. 2010) (holding that $400 per hour was a reasonable hourly rate for leading civil rights attorney with over twenty-five years of experience in the field); *Todaro v. Siegel Fenchel & Peddy, P.C.*, 697 F. Supp. 2d 395, 399 (E.D.N.Y. 2010) (holding that $400 per hour was a reasonable rate for a partner with seventeen years of employment discrimination litigation experience). Instead, the Court concludes that $250 per hour is a reasonable hourly rate for an attorney of Blangiardo's experience and competence in the area of employment and age discrimination. *See Hugee*, 852 F. Supp. 2d at 302 (reducing requested rate of $400 per hour to $200 per hour, where attorney's experience in the area of civil rights litigation more closely approximated a junior associate's level of experience than that of a partner).[8]

B. Reasonable Hours

Having determined a reasonable hourly rate for Blangiardo, the Court must determine the reasonable number of hours expended by Blangiardo in this litigation.

"The party seeking attorney's fees also bears the burden of establishing that the number of hours for which compensation is sought is reasonable." *Custodio v. Am. Chain Link & Const., Inc.*, No. 06-CV-7148 (GBD), 2014 WL 116147, at *9 (S.D.N.Y. Jan. 13, 2014) (citing *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994)). "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch*, 148 F.3d at 173. "Hours that are 'excessive, redundant, or otherwise unnecessary,' are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Id.* (quoting *Hensley*, 461 U.S. at 434; *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983)); *see also Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("We do not require that the court set forth item-by-item findings concerning what may be countless objections to individual billing items."). For example, in *Matusick v. Erie County Water Authority*, the Second Circuit upheld a district court's fifty percent across-the-board reduction in hours in light of "concerns regarding unspecified conferences, telephone calls, email correspondence, and reviews." --- F.3d ----, Nos. 11-1234, 11-1618, 2014 WL 700718, at *26–27 (2d Cir. Feb. 25, 2014) (internal quotation marks and citations omitted); *see also Francois v. Mazer*, 523 F. App'x 28, 29 (2d Cir. 2013) (upholding forty percent across-the-board reduction in hours); *Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (upholding fifteen percent across-the-board reduction); *Kirsch*, 148 F.3d at 173 (upholding "20% reduction for vagueness, inconsistencies, and other deficiencies in the billing records").

In the instant case, Blangiardo submits records showing that he spent 498.20 hours on this litigation. However, the Court

---

[8] In arriving at this hourly rate, the Court has considered all of the *Johnson* factors. *See Arbor Hill*, 522 F.3d at 190. For example, the Court has determined that this case neither posed any novel or difficult issues, nor required a high level of skill to perform the legal service properly, nor was it particularly undesirable.

determines that Blangiardo's hours should be reduced by thirty-three percent because of several major problems with Blangiardo's billing records. *See, e.g.*, *Rahman v. Smith & Wollensky Restaurant Grp., Inc.*, No. 06-CV-6198 (LAK)(JCF), 2008 WL 1899938, at *4 (S.D.N.Y. Apr. 29, 2008) (applying thirty-three percent reduction where time entries showed "excessive billing or duplicative work"). First, Blangiardo's records reflect that Blangiardo's standard practice was to record his time in increments of one-half hour, even for tasks that should have taken far less time to perform. For instance, Blangiardo recorded a total of sixty-eight telephone calls with plaintiff; all but four are recorded in half-hour increments, and sixty-three are billed for exactly one-half hour. (*See* Blangiardo Billing Records, Blangiardo Decl., Sept. 16, 2013, Ex. 9 ("Blangiardo Billing Records").) It is inconceivable to the Court that almost every phone call between plaintiff and Blangiardo lasted one-half hour. Examination of Blangiardo's billing for other tasks confirms the Court's suspicion that Blangiardo recorded one-half hour of his time for any task that lasted one-half hour or less. For instance, on January 4, 2012, Blangiardo billed one-half hour of his time for a pre-trial telephone conference that lasted only four minutes. (*See id.*; *see also* Minute Entry, Jan. 4, 2012, ECF No. 42.) On December 5, 2012, Blangiardo billed one-half hour of his time to "Review Letter Motion for Leave to File Excess Pages." (Blangiardo Billing Records.) The letter motion at issue was a one paragraph request by defense counsel to exceed the twenty-five page limit in her memorandum supporting defendant's post-trial motions (*see* ECF No. 71), and the Court does not believe it likely (or reasonable) that Blangiardo spent an entire half hour to review such a letter. Similarly, Blangiardo billed one-half hour on April 13, 2011 to "Review scheduling Order re: Conference date change." (*Id.*) The Court's order described in this entry simply rescheduled a pre-motion conference, and it is inconceivable (or, in any event, unreasonable) that Blangiardo spent one-half hour reviewing it.

Relatedly, Blangiardo's records show possible overbilling on certain occasions. For example, Blangiardo billed 3.2 hours for oral argument before this Court on February 15, 2013. (*See* Blangiardo Billing Records.) According to the Court's Minute Entry, that oral argument lasted forty-seven minutes. (*See* Minute Entry, Feb. 18, 2013, ECF No. 81.)[9] Blangiardo also billed 2.2 hours to prepare for that oral argument and 1.0 hour to confer with plaintiff afterward; thus, the 3.2 hours that Blangiardo billed for oral argument did not include preparation time. As other examples of possible overbilling for Blangiardo's time in court, Blangiardo recorded 4.0 hours on March 3, 2010 for a conference with Magistrate Judge Tomlinson that lasted twenty-seven minutes, and he recorded 4.5 hours on December 6, 2010 for a status conference with Magistrate Judge Tomlinson that lasted approximately thirty minutes. (*See* Blangiardo Billing Records; Minute Entry, Mar. 3, 2010, ECF No. 6; Minute Entry, Dec. 11, 2010, ECF No. 16.) The Court has considered the possibility that Blangiardo included his travel time to and from the courthouse in the foregoing billing entries. Even if this were true, the Court would reduce the amount of Blangiardo's fee by fifty percent for travel time. *See, e.g.*, *Hugee*, 852 F. Supp. 2d at 302 (reducing attorney's hourly rate by fifty percent for travel time, and noting that courts in this Circuit usually reduce attorneys' fees by fifty percent for travel time); *Adusumelli v. Steiner*, No. 08-CV-6932 (JMF), 2013 WL

---

[9] The Court's Minute Entry states incorrectly that the date of oral argument was February 18, 2013.

1285260, at *5 (S.D.N.Y. Mar. 28, 2013) (noting that "courts in the Second Circuit regularly reduce attorneys' fees by 50 percent for travel time" (internal quotation marks omitted)); *accord Barfield v. N.Y.C. Health & Hospitals Corp.*, 537 F.3d 132, 139 (2d Cir. 2008) (referring to fifty percent reduction in attorneys' rate for travel time as "established court custom"). However, Blangiardo's use of "block billing"—*i.e.*, recording "a single time entry that includes a variety of distinct tasks," *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, No. 04-CV-3600 (SWK), 2005 WL 3099592, at *5 n.9 (S.D.N.Y. Nov. 17, 2005) (Report & Recommendation)—prevents the Court from determining how much time was spent on travel, and how much time was spent on other tasks. Accordingly, these vague and possibly excessive entries warrant an across-the-board reduction in hours. *See, e.g.*, *id.* at *7 (reducing hours by 25% due to "instances of block billing, vagueness, and excess").

Finally, there are at least several instances where Blangiardo took an unreasonably long time to perform a task, block billed, or simply overbilled his time. For instance, Blangiardo recorded 1.2 hours to "Review Order Granting Pre-Motion Conference" on February 18, 2011 (*see* Blangiardo Billing Records)—an order that merely scheduled a date for a telephone conference. In addition, he billed 2.0 hours on February 21, 2011 to "File Letter Motion for Extension of Time Pre-Trial Order" (*see id.*), which was a two sentence letter to Magistrate Judge Tomlinson (*see* ECF No. 27). Blangiardo also billed 6.0 hours on December 16, 2010 to "Draft Motion for Deposition of Mulrain and Pumillo" (*see* Blangiardo Billing Records); that motion was simply a one paragraph letter to Judge Tomlinson requesting to take the depositions of two individuals (*see* ECF No. 19). Whether these entries represent the accurate but unreasonable amount of time spent on these tasks, include other tasks that Blangiardo did not specify in these entries (*i.e.*, block billing), or are instance of overbilling, they warrant an across-the-board reduction in hours.

In light of these substantial problems with Blangiardo's billing records, and the vagueness of some of Blangiardo's other entries, the Court concludes that a thirty-three percent across-the-board reduction in Blangiardo's hours is warranted. Thus, the Court calculates the lodestar amount based on 333.79 hours expended by Blangiardo in this litigation.[10]

\*   \*   \*

Accordingly, the Court calculates the lodestar figure to be $83,447.50, which represents 333.79 hours of Blangiardo's time at a rate of $250 per hour.[11] Moreover, the Court sees no reason to depart from this lodestar figure in this case, *see, e.g.*, *Perdue*, 559 U.S. at 553 (noting that lodestar figure includes "most, if not all," relevant factors in setting reasonable attorney's fee), and thus awards plaintiff $83,447.50 in attorneys' fees.

### C. Costs

"As for costs, a court will generally award 'those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" *Pennacchio v. Powers*, No. 05-CV-985 (RRM)(RML), 2011 WL 2945825, at *2 (E.D.N.Y. July 21, 2011) (quoting *LeBlanc-Sternberg v. Fletcher*, 143

---

[10] 498.20 - (498.20 * .33) = 333.794.
[11] Although plaintiff's counsel was retained on a contingency-fee basis, "the contingency fee may not serve as a cap on an attorney fee award." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 142 (2d Cir. 2007).

F.3d 748, 763 (2d Cir. 1998)). "The fee applicant bears the burden of adequately documenting and itemizing the costs requested." *Id.*; *see also First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, No. 10-CV-696 (KAM)(SMG), 2013 WL 950573, at *10 (E.D.N.Y. Mar. 12, 2013). In particular, under Local Civil Rule 54.1, "the party must include as part of the request "'an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred,'" and "[b]ills for the costs claimed must be attached as exhibits." *D.J. ex rel. Roberts v. City of New York*, No. 11-CV-5458 (JGK)(DF), 2012 WL 5431034, at *9 (S.D.N.Y. Oct. 16, 2012) (quoting Local Civ. R. 54.1(a)), *report & recommendation adopted sub nom. Roberts v. City of New York*, 2012 WL 5429521 (S.D.N.Y. Nov. 7, 2012).

Here, plaintiff requests $5,967 for the following litigation costs: the filing fee ($350), subpoenas for trial witnesses ($1,080), transcripts ($3,990), postage ($132), and copies ($415). (*See* Pl.'s Supp. Mem. at 11.) Blangiardo submitted an affidavit stating that his total costs were $5,967 (*see* Blangiardo Aff., Sept. 16, 2013); however, he did not attach as exhibits any supporting documentation. Although the Court could deny plaintiff's request for costs on this basis, *see, e.g.*, *De Alvarez v. City of New York*, No. 10-CV-4434 (SJ)(LB), 2012 WL 2087761, at *3 (E.D.N.Y. May 16, 2012), *report & recommendation adopted sub nom. Alvarez v. City of New York*, 2012 WL 2087759 (E.D.N.Y. June 8, 2012), in this case, the Court grants plaintiff one more chance to submit supporting documentation for these costs.

IV. CONCLUSION

For the reasons set forth herein, the Court grants in part and denies in part the instant motion. The Court orders that the District reinstate plaintiff to a teaching position, awards plaintiff front pay damages in the amount of $19,745, orders that the District make contributions to plaintiff's pension plan, and awards plaintiff $83,447.50 in attorneys' fees. The Court denies plaintiff's requests for seniority credit in his new position and reinstatement with tenure. Additionally, the parties shall submit supplemental letters concerning the amount of contributions the District must make to plaintiff's pension. Finally, plaintiff shall submit supplemental documentation in support of his motion for costs.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 16, 2014
      Central Islip, NY

\*    \*    \*

Plaintiff is represented by Frank J. Blangiardo, Frank J. Blangiardo, Esq., P.O. Box 1169, Cutchogue, NY 11935. Defendant is represented by Jeltje DeJong, Joshua S Shteierman, and Kelly E Wright, Devitt Spellman Barrett, LLP, 50 Route 111, Smithtown, NY 11787.